# IN THE COURT OF APPEALS OF IOWA

No. 22-1121
Filed November 2, 2022

**IN THE INTEREST OF A.A. and S.A.,**
**Minor Children,**

**S.T., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Des Moines County, Jennifer S. Bailey, District Associate Judge.

        A mother appeals a permanency order denying her request for six more months to reunify with two of her children and placing guardianship with an aunt. **AFFIRMED.**

        Ryan D. Gerling of Cray Law Firm, PLC, Burlington, for appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

        Heidi D. Van Winkle, Burlington, attorney and guardian ad litem for minor children.

        Considered by Bower, C.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

All parties asked the juvenile court in April 2022 to grant the parents of one-year-old A.A. and three-year-old S.A. a six-month deferral of permanency. The children had been out the home for nearly a year. Their mother, Samantha, had struggled with methamphetamine addiction and other mental-health issues. But the Department of Health and Human Services (DHHS) focused on her recent progress—successfully completing substance-abuse treatment, testing drug free for four months, participating in services, and securing employment. So the DHHS recommended more time for reunification.

Despite that recommendation, the juvenile court went another direction. It declined to delay permanency and instead established a guardianship with the paternal aunt who has been caring for A.A. and S.A.[1] On appeal, Samantha argues the court should have given her six more months to reunify with her son, A.A., and her daughter, S.A. She also contests an evidentiary ruling. On that ruling, we detect no abuse of discretion. On the overarching claim, we find the permanency option chosen by the juvenile court served the "unique dynamics" of this family and promoted the best interests of the children. Thus, we affirm the permanency order.

---

[1] Samantha is the only party to appeal the permanency order. The children's father, Andrew, does not challenge the order. The State filed a statement taking no position on the appeal. The permanency hearing also addressed the custody of Samantha's older sons, J.G. and V.E. The order placing them in the sole custody of their fathers is not the subject of this appeal.

### I.      Facts and Prior Proceedings

This family is not new to the juvenile court.  Samantha's son, G.A., tested positive for methamphetamine at birth in 2017.   In that case, Samantha consented to termination.  G.A. was adopted by Andrew's parents.

S.A. was born in March 2019; her brother A.A. was born in November 2020. A.A. tested positive for marijuana at birth.   The parents agreed to voluntary services in early 2021.   When both Andrew and Samantha tested positive for methamphetamine that April, the DHHS developed a safety plan, placing the children in the home of their paternal aunt.  In May 2021, the parents took the children from a visit without permission, prompting the DHHS to seek a removal order.  The court adjudicated S.A. and A.A. as in need of assistance (CINA) in June 2021.

Ever since, S.A. and A.A. have remained in their aunt's care.  The young children are comfortable in that home, and the aunt has expressed a long-term commitment to their well-being.  The relative placements also ensured that the younger siblings had visits with their older brothers.

Meanwhile, Samantha made little progress toward reunification with the children.  In a July 2021 dispositional order, the court offered this assessment:

> Samantha and Andrew clearly continue to struggle with their addiction to methamphetamine and there is no doubt to this judge that they are current users.   Samantha adamantly denies methamphetamine usage, despite all signs to the contrary.   It is disheartening that a mother as experienced as Samantha in the world of Child in Need of Assistance proceedings is still unable to admit that she is using and ask for help.

Both parents tested positive for methamphetamine in July.  Because of the parents' continued use of illegal drugs, the court set a permanency hearing for

November 2021. But when the parents attained sobriety in early fall of 2021, the court redesignated the November proceeding as a review hearing to provide them more time to provide a safe living environment for the children. At that review hearing, the court received Samantha's recent mental-health evaluation, which revealed several diagnoses, including borderline personality disorder; post-traumatic stress disorder; persistent depressive disorder; anxiety disorder; and stimulant use disorder, amphetamines, in remission. She had previously been diagnosed with anxiety, obsession compulsive disorder, depression, reactive attachment disorder, oppositional defiance disorder, and ADHD.

Adding an extra consideration, that fall Samantha was pregnant with twins, who were born in March 2022. She then lived with the twins' father, Patrick, whose other children had been adjudicated as CINA in a separate action involving allegations of physical abuse and methamphetamine use.

The court held the permanency hearing in April 2022. Samantha testified she had not used methamphetamine since late June 2021. But an exhibit offered by the State showed results from her November 2021 hair stat test were positive for methamphetamine. Samantha doubted the accuracy of that test, so she paid for her own. But the court would not allow her attorney to offer the results as an exhibit, ruling "foundation has not been laid for the admission of the hair stat test."

At the hearing, the State offered an exhibit in which the DHHS recommended the court grant a six-month extension for determining permanency for S.A. and A.A. The worker expressed that Samantha had "made progress." But it was not an unqualified endorsement of her prospects, noting that her behavior pattern was to do well when the DHHS and court were involved. The worker was

concerned that Samantha would be overwhelmed providing care to four children under the age of three. "Her support system is limited. The relationship that she is in with Patrick has a history of arguments."

The guardian ad litem (GAL) was also "torn between termination and extension for six months." The GAL's report shared her concern that the parents would not be ready to reunite with the children in six months, saying she believed they had done "barely enough to receive additional time to get done what they need to raise their children." The GAL said at the hearing: "The only reason why I was willing to agree with six more months is we weren't modifying where the children were at. They are in a stable place where my understanding is, regardless of the outcome of this, in six months they will remain."

In the permanency ruling, the court did not opt to move toward termination of parental rights. But neither did it decide that Samantha could reunite with the children if permanency was deferred for six months. Picking a third option, the court placed the children in a guardianship with their paternal aunt, reasoning:

> [T]he unique complexion of this case necessitates a unique permanency plan. A guardianship will ensure permanency. It will protect a bond between the children and the parents, who would be part of their life regardless. It also acknowledges that Samantha and Andrew have not done the work to show that they can safely raise these kids now or in six months.

Samantha appeals.

## II.     Scope and Standards of Review

We review permanency orders de novo. *In re D.M.*, 965 N.W.2d 475, 479 (Iowa 2021). But we review evidentiary rulings for an abuse of discretion. *In re N.N.*, 692 N.W.2d 51, 54 (Iowa Ct. App. 2004). An abuse of discretion occurs

when the juvenile court's ruling is unreasonable, unsupported by substantial evidence, or results from a faulty application of the law. *In re E.H.*, 578 N.W.2d 243, 246 (Iowa 1998).

### III. Analysis

### A. Refusal to Admit Lab Report Offered by Mother's Counsel

As her first claim, Samantha confronts the court's refusal to admit as an exhibit the laboratory report from a hair stat test she obtained at her own expense. She asserts the ruling was an abuse of discretion, citing Iowa Code section 232.99(2) (2021) ("All relevant and material evidence shall be admitted.").

At the permanency hearing, the mother's counsel offered an exhibit from Quest Diagnostics showing Samantha's hair specimen collected on November 30, 2021, tested negative for methamphetamine. The document noted: "specimen received and processed in the Lenexa DHHS certified laboratory." The assistant county attorney objected to its admission on lack of foundation, arguing no doctor testified as to the laboratory and nobody testified to the chain of custody. Counsel replied, "[M]y client testified that she got the test. These are the results." Counsel also argued that he "just learned of this specific issue" and did not have time to call additional witnesses to lay foundation.

The juvenile court agreed with the State that "the foundation has not been laid for the admission of the hair stat test." Recognizing that the State had offered its own exhibit showing laboratory results of a positive test, *without any testimony*, the court added: "The State didn't have to go through that because it was agreed to by the mother that it be entered and it was offered by a laboratory which is used by the Department of Human Services in all cases." We are unaware of any

authority supporting the court's latter proposition—that the State is excused from laying foundation for exhibits from certain approved laboratories. *See generally In re H.V.*, No. 20-0934, 2020 WL 6157826, at *5 (Iowa Ct. App. 2020) (noting that Iowa Rule of Evidence 5.901(a) requires proponent of exhibit to produce evidence to support finding that item is what proponent claims it is). But we acknowledge that Samantha did not object to the State's proposed exhibits.

As to the court's ruling on Samantha's exhibit, we are not convinced that section 232.99(2), directing juvenile courts to admit "all relevant and material evidence," allows a party to bypass laying foundation for an item's authenticity. We have held that foundational witnesses are necessary in CINA cases. *See, e.g.*, *In re A.B.*, No. 21-1495, 2022 WL 108586, at *3 (Iowa Ct. App. Jan. 12, 2022); *In re A.C.*, No. 13-1045, 2013 WL 5962918, at *2 (Iowa Ct. App. Nov. 6, 2013). So the court was correct in entertaining the State's objection.[2] But one means to authenticate evidence is the testimony of a person with knowledge that the exhibit is what the proponent claims it to be. Iowa R. Evid. 5.901(a)(1); *see State v. Musser*, 721 N.W.2d 734, 750 (Iowa 2006) (rejecting challenge that witness did not conduct lab tests, never examined person tested, and knew nothing about test protocols or method of record keeping). Yet Samantha does not argue on appeal that her own testimony was sufficient to lay foundation. Without that argument, we affirm the juvenile court's evidentiary ruling.

---

[2] In her petition on appeal, Samantha argues that "as a policy matter" we should not require a parent to follow "detailed foundation requirements" for admitting lab reports into evidence. Because that argument was not advanced in the juvenile court, we cannot consider it on appeal.

**B. Denial of Request for Six-Month Delay of Permanency**

As her more consequential issue, Samantha contends the juvenile court erred in finding that she had not made sufficient strides to merit a delay in permanency.[3]  *See* Iowa Code § 232.104(2)(b) (2022).  Samantha stresses that all parties had "good reason to think that [she] would be able to remediate the need for removal with an additional six months."  She criticizes the court for disregarding her "substantial, if imperfect, progress."

Contrary to Samantha's criticism, the court did not disregard the information provided by the DHHS or the GAL (neither of which gave a full-throated endorsement of the parents' request for more time).  Rather, it recognized its responsibility under section 232.104(2)(b) to "make the requisite findings" that the need for removal would "no longer exist at the end of the additional six-month period."  *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021).  The court had an in-depth understanding of Samantha's family history and could not find that she had made substantial progress in addressing her long-standing methamphetamine addiction or unstable mental health.  The court acknowledged that Samantha was "a good mother, when she is stable and sober."  And the court lauded her strong bond with the children.

But the court chronicled Samantha's methamphetamine addiction, fueled by her mental-health issues, which has led her to a "life of chaos."  The court recalled Samantha's earlier efforts to manipulate her drug tests by bleaching her

---

[3] In her issue heading, Samantha adds that the court erred in finding the department made reasonable efforts at reunification.  But she does not discuss that claim in the body of her petition on appeal.  So likewise we do not address reasonable efforts.

hair and her "fits of rage" described by Andrew. The court also worried about Samantha's new boyfriend, Patrick, who has a history of methamphetamine use and physical abuse. And the court noted that Samantha's recent psychological evaluation cautioned that she "evidenced little insight into the impact of her choices on the health and safety of her children." Also concerning mental health, the court had "great concern" that Samantha had not kept up her medication management since 2019 and was not participating in counseling. Tying those threads together, the court reasoned: "Samantha's sobriety being new and tenuous, and her mental health needs being virtually unaddressed, casts even greater light upon the fact that [Patrick] is an unhealthy partner."

Being frank, the court decided that after six months it would not be in a better position to decide whether her sobriety "was going to stick this time around. In fact, all indications point to a relapse." The court could not envision Samantha raising four children under the age of three. The court allowed that for children as young as A.A. and S.A., "adoption may seem like an appropriate permanency goal." *See In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018) (reiterating guardianship is not legally preferable alternative to termination). But still the court steered toward a guardianship to honor the bond that Samantha has "cultivated with both children." The court stated:

> [A]lthough not the preferred method for establishing permanency for such young children, a guardianship ensures that, if Samantha or Andrew do attain prolonged stability and sobriety, then the guardianship may be terminated. It is also acknowledges the change in Iowa Code Chapter 232D, which grants exclusive jurisdiction to the juvenile court to review said cases, ensuring that annual reports and any requests for modification, will be monitored by the very court that ordered the guardianship.

In support of a guardianship, the court explained that the paternal aunt—who has declining health—receives considerable support from Andrew's mother, who has adopted Samantha's now five-year-old son, G.A. The court believed that "the unique complexion of this case necessitates a unique permanency plan."

Although our review is de novo, we lack the insight that the juvenile court brings after five years of observing this family. Using that insight, the court gave compelling reasons for not granting Samantha a six-month extension. From our more distant vantage point, we reach the same conclusion. And we agree that the children's best interests are served by remaining in the care of their aunt.[4] As it stands, Samantha may have lost this battle, but she could still win the war. As the juvenile court highlighted, a guardianship, rather than termination of parental rights, keeps alive the prospect that Samantha could reunite with her children again. We decline to disturb the permanency order.

**AFFIRMED.**

Bower, C.J., concurs; Ahlers, J., concurs specially.

---

[4] Samantha does not directly challenge the establishment of a guardianship. In fact, she embraces the fact that the children remain in the care of their aunt: "Particularly in light of the guardianship disposition, there was little reason for the Court to rush to permanency in the matter. . . . [T]he children had been in the guardian's care for nearly their entire lives, continuing for another six months would have made little difference on their care or their ability to move forward."

**AHLERS, Judge** (specially concurring).

I have no disagreement with the well-written majority opinion. In fact, I join the opinion without reservation. I write separately to highlight the juvenile court's thorough work in crafting the permanency order.

In my view, it was not a particularly close call to deny the request to give the parents an additional six months to work toward reunification. The more difficult call was deciding not to direct the county attorney or the attorney for the child to start termination-of-parental rights proceedings pursuant to Iowa Code section 232.104(2)(c) (2021). Choosing the permanency option of establishing a guardianship rather than directing the initiation of termination proceedings is not a routine call. In fact, with children as young as this, it is a tough sell given our case law opposing long-term guardianships. *See, e.g.*, *In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021) (reiterating opposition to "a long-term guardianship" and reinforcing the principle that "a guardianship is not a legally preferable alternative to termination").

Besides not being legally preferable to termination, a guardianship is not even a permissible permanency option unless the juvenile court first finds that termination would not be in the children's best interest. *See* Iowa Code §§ 232.104(2)(d)(1) (allowing establishment of a guardianship as a permanency option), .104(4)(a) (only permitting permanency options under section 232.104(2)(d) upon showing that termination of parental rights is not in a child's best interest). Despite my initial hesitation to approve a guardianship for such young children, the juvenile court's thorough, articulate, and focused explanation of why termination is not in the children's best interest and why the

unique circumstances of this case call for establishment of a guardianship despite the young ages of the children persuades me that this is the right result.  Therefore, I join in the majority opinion.